Filed 9/3/20  In re K.M. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re K.M., a Person Coming Under the Juvenile Court Law. | B300629 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 18LJJP00476E) |
| Plaintiff and Respondent, | |
| v. | |
| STEWART M., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Robin R. Kesler, Judge Pro Tempore.  Affirmed.

Jaime A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kim Nemoy, Assistant County Counsel, and John C. Savittieri, Deputy County Counsel, for Plaintiff and Respondent.

_____

Stewart M. (Father) appeals from the juvenile court's refusal to release his son K.M. to his custody at the disposition hearing. Substantial evidence supports the juvenile court's dispositional finding by clear and convincing evidence that there would be a substantial danger to K.M.'s physical health, safety, protection, physical or emotional well-being, and special needs and that there are no reasonable means by which K.M.'s physical health can be protected if K.M. were released to Father. We affirm.

## FACTS

On July 15, 2018, five-year-old K.M. was found alone approximately a mile from his home in the Antelope Valley. K.M. was not wearing a shirt or shoes. His maternal grandmother found him shortly after the police arrived. She and A.S. (Mother) had been searching for K.M. in the neighborhood but did not report him missing because he often ran away from home. The maternal grandmother told officers he would leave whenever a door was left open so they kept the doors locked. She believed he left through a window that day.

The officers escorted K.M. and the maternal grandmother home. They called the paramedics when K.M. fell unconscious after he arrived home. The maternal grandmother speculated he was unwell because it was very hot. The paramedics determined K.M. had low blood pressure and a low pulse. They gave K.M. a dose of Narcan, which is used to combat drug overdose, on the way to the hospital. He did not respond to the Narcan and he later tested negative for narcotics at Antelope Valley Hospital. Because medical personnel at Antelope Valley Hospital were unable to diagnose him, K.M. was transferred to Children's Hospital of Los Angeles where he spent several days under

observation. Children's Hospital diagnosed K.M. with an unspecified neuro-developmental disorder, which could be associated with neglect or trauma, and childhood disintegrative disorder, which is included in autism spectrum disorder. He also exhibited altered mental status and developmental regression.

The Los Angeles County Department of Children and Family Services (DCFS) filed a petition pursuant to Welfare and Institutions Code section 300, subdivisions (b) and (j),[1] on behalf of K.M. and his half-siblings, John S., P.S., D.S., and L.G.[2] The petition alleged K.M. and his half-siblings were at substantial risk of harm due to Mother's failure to provide the children with appropriate parental care, supervision, and a secure home environment, as evidenced by the incident involving K.M. running away from home on July 15, 2018. A first amended petition added an allegation under section 300, subdivision (b), that Mother's history of substance abuse and alcohol abuse rendered her incapable of providing regular care for the children.

DCFS located Father in Las Vegas and he contacted DCFS on September 13, 2018. He confirmed he was living with his mother in Las Vegas. When the children's social worker advised Father of the allegation against Mother, he stated, "I'm not surprised that she had her kids taken. She is always drunk." He related an incident in which Mother was detained in Nevada with K.M. because she was intoxicated and the maternal grandmother had to travel there to retrieve K.M.

---

[1] All further section references are to the Welfare and Institutions Code.

[2] Neither Mother nor the half-siblings are parties in this appeal. As a result, we need not discuss the facts of the dependency proceedings that relate solely to them.

Father also told the social worker he visited K.M. at the maternal grandmother's house before he moved to Las Vegas approximately three to four months ago. Mother was drunk and had locked herself in a room. K.M. was knocking and screaming to get in the room with her. He was so upset, he had a seizure. Father, who also had seizures, put him on his side and wiped his face with a warm rag. Father stated neither Mother nor the maternal grandmother knew what to do. Additionally, they failed to obtain anti-seizure medication for K.M.

Father expressed concern for K.M.'s safety and believed he could better care for K.M. He planned to seek custody of K.M. in family court but "wanted to get [him]self together first." Father indicated he had applied for a housing voucher for a four-bedroom apartment in Las Vegas for himself, K.M., and his two other sons who stay with him during the summer. Father described the maternal grandmother as "a cold piece of work" who spanked K.M., but not her other grandchildren.

The children were ordered removed from Mother's custody at the September 25, 2018 detention hearing. Father appeared at the detention hearing and requested custody of K.M. Father acknowledged he had a criminal history but was working toward turning his life around. While he was incarcerated, he completed a parenting course, a Hope for Prisoners program and received numerous certificates of recognition. Father advised the court he had two other children who were in his care and he was pursuing low income housing for all of them. He complained to the juvenile court he had not had visits with K.M. due to the maternal grandmother's lack of support. The children were placed in foster care.

4

K.M.'s counsel advised she had no objection to releasing K.M. to Father if K.M. showed familiarity with Father and did not have an adverse reaction to him.  DCFS counseled against moving "too fast" in releasing K.M. to Father since he currently lived in a small apartment with his mother and his two other children.  Additionally, DCFS observed Father did not have a relationship with K.M.  Mother joined in DCFS's position.

The juvenile court ordered DCFS to use its best efforts to conduct an assessment of Father's housing in Las Vegas.  It also allowed DCFS discretion to release K.M. to Father, but stated it wanted Father to visit with K.M. first.  DCFS later reported it was unable to conduct an assessment of Father's home without making a request to the local child welfare agency in Nevada through the Interstate Compact on the Placement of Children.

In its jurisdiction/disposition report, DCFS recommended the juvenile court sustain the allegations against Mother.  The social worker surmised Mother was intoxicated or under the influence of drugs at the time K.M. was found on July 15, 2018. The family reported K.M. was speaking, knew his letters, numbers, and name, and was potty trained by the age of three or four.  He regressed after his maternal grandfather died last year, however.  At age five, he stopped speaking and reverted to bedwetting.  Despite this regression, Mother failed to seek any developmental or medical services for him.

DCFS also questioned Father's ability to care for K.M. DCFS noted Father moved to Las Vegas even though he had concerns about K.M.'s safety.  In addition, Father had an extensive criminal history, including convictions for domestic violence and a possible outstanding warrant.  As a result, the juvenile court ordered DCFS to address Father's warrant and

parole standing and any safety obstacles to releasing K.M. to him. DCFS later reported Father did not have any active arrest warrants and his parole had been terminated. It continued to question Father's ability to care for K.M., however.

The juvenile court ordered an assessment of the maternal grandmother's home as well as the maternal great-aunt's home for the children. DCFS opposed placement with the maternal grandmother, noting K.M. ran away while he was at the maternal grandmother's home and questioning whether the maternal grandmother had the ability to care for all of the children. The children were subsequently placed with the maternal great-aunt.

On January 2, 2019, a second amended petition was filed to include failure-to-protect allegations against Father. By April 9, 2019, Father had yet to visit with K.M. despite the juvenile court's concern that he lacked a relationship with K.M. The children's social worker reported he did not have a visitation plan and DCFS had no contact with Father since January 2019.

At the jurisdictional hearing, the juvenile court sustained an allegation under section 300, subdivision (b) that Mother was under the influence of alcohol when she failed to adequately supervise K.M., who was found alone a mile from home on July 15, 2018. The court further found Father knew of Mother's failure to provide adequate supervision, and his failure to protect K.M. placed him at substantial risk of serious physical harm. The dispositional hearing was continued to August 29, 2019, to allow notice to be made to the father of John S., P.S., and D.S.

In a last-minute information, DCFS informed the juvenile court it alerted Father by letter dated June 3, 2019, that he could call K.M. on Monday, Wednesday, and Friday of each week at 4:30 p.m.  However, Father failed to make contact with K.M.

At the dispositional hearing, Father again requested K.M. be released to him.  K.M.'s attorney opposed releasing K.M. to Father because he had failed to keep contact with K.M. or DCFS during the proceedings.  K.M.'s attorney expressed concern regarding Father's commitment to parenting K.M.  DCFS argued Father was aware K.M. did not have anti-seizure medication and was apprehensive about his safety in Mother's care, yet decided to move to Las Vegas without notifying the authorities about his concerns.

The juvenile court found by clear and convincing evidence under section 361, subdivisions (c) and (d), that a substantial danger existed to the physical health, safety, protection, physical or emotional well-being, and special needs of K.M. and there are no reasonable means by which K.M.'s physical health can be protected if K.M. were released to Father or returned to Mother.  The court declined to liberalize Father's visits to unmonitored visits, noting Father had no visitation with K.M. during the entirety of the proceedings.  However, it maintained its order to allow DCFS discretion to release K.M. to Father.  Father appealed.

**DISCUSSION**

On appeal, Father does not challenge the court's jurisdictional finding that he failed to protect K.M. from Mother's neglect. He instead argues there was not clear and convincing evidence to support removing K.M. from his custody. We conclude substantial evidence supports the juvenile court's dispositional findings.

## I.     Standard of Review

Section 361, subdivision (d), decrees: "A dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child did not reside at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence that there would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child for the parent . . . to live with the child or otherwise exercise the parent's . . . right to physical custody, and there are no reasonable means by which the child's physical and emotional health can be protected without removing the child from the child's parent's . . . physical custody." If the court orders that a child be removed from parental custody at the dispositional hearing, it must determine "whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home . . . ." (§ 361, subd. (e).) " ' "The focus of the statute is on averting harm to the child," ' " and the court " 'may consider a parent's past conduct as well as present circumstances.' " (*In re A.S.* (2011) 202 Cal.App.4th 237, 247, disapproved on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)

We review the dispositional findings for substantial evidence.  (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1161, 1163–1164; *In re A.R.* (2015) 235 Cal.App.4th 1102, 1115–1116.)  The California Supreme Court has recently explained that "when reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable factfinder could have found it highly probable that the fact was true.  Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence."  (*Conservatorship of O.B.*, *supra,* 9 Cal.5th at pp. 995–996.)

## II.  Substantial Evidence Supports the Dispositional Findings

Here, the record as a whole contains substantial evidence from which a reasonable factfinder could have found it highly probable that there would be a substantial danger to K.M.'s physical health, safety, protection, physical or emotional well-being, and special needs if he were released to Father's custody, and that there are no reasonable means by which K.M.'s physical health can be protected if Father gained custody.  (*Conservatorship of O.B., supra,* 9 Cal.5th at pp. 995–996.)

The record discloses Father admitted he knew Mother "is always drunk" and that she was detained in Nevada on one occasion with K.M. because she was intoxicated.  He also witnessed K.M. suffer from a seizure during a visit and knew

9

Mother had failed to obtain anti-seizure medication for K.M.  He believed the maternal grandmother singled K.M. out for harsher punishment than his half-siblings.  As a result, Father had concerns about K.M.'s safety while in Mother's custody.

Yet, Father moved to Nevada without addressing any of the issues he perceived K.M. faced while in Mother's care.  Father did not confront Mother about her alcohol abuse.  He failed to obtain anti-seizure medication for K.M. or remind Mother to get it.  He also failed to raise the issue of the maternal grandmother's treatment of K.M. with Mother or the maternal grandmother.  Although Father indicates his decision to move was not frivolous and was the result of family or economic circumstances, he fails to explain why he did not report his concerns to authorities or address them with Mother before he left.

Moreover, Father failed to visit K.M. during the year-long dependency proceedings.  —Father first contacted DCFS on September 13, 2018, and the court made its dispositional orders on August 29, 2019.  Although Father reported at the detention hearing that the maternal grandmother did not support his visits, he still failed to visit when K.M. was placed elsewhere.  Indeed, Father never called K.M. even when the children's social worker advised him she had set up thrice-weekly telephonic visits in June 2019.  The only documented interaction between Father and K.M. in the record is Father's visit with him three or four months prior to his move to Nevada.

Further, the record discloses K.M. had special needs.  His family reported he had regressed substantially in the past year; he no longer spoke and he wet himself despite having previously been successfully potty trained.  He was diagnosed with an unspecified neuro-developmental disorder and autism spectrum

10

disorder. There is no indication Father has educated himself about K.M.'s diagnoses or worked to ensure he could properly care for K.M. Indeed, Father failed to maintain regular contact with DCFS to discuss K.M.'s progress, indicating an unwillingness or inability to care for K.M. The record contains substantial evidence supporting the juvenile court's dispositional findings.

Father asserts he has demonstrated his ability to care for K.M. because he was out of legal trouble, had no outstanding warrants, completed programs, including a parenting education class in connection with his parole, and attained appropriate housing for K.M. and his other children. While it is apparent Father is trying to turn his life around and we presume Father's housing is appropriate for K.M., none of these facts override the substantial evidence cited above. There simply is no evidence Father has the ability to care for K.M. and his special needs, has ever tried to care for K.M., or has actually provided care for K.M. in a parental capacity.

Father argues removal is not warranted because his is not an "extreme" case of abuse or neglect as set forth in section 361, subdivision (c). Father, however, acknowledges that removal of a child from a noncustodial parent is governed by subdivision (d) of section 361, not subdivision (c), which focuses on removal of a child from a custodial parent. Father is a noncustodial parent because K.M. did not live with him at the time of the proceedings.

In any case, both subdivision (c) and (d) of section 361 permit removal where "[t]here would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being" of the minor and "there are no reasonable means by which [his or her] physical health can be protected" without

11

removal. As discussed above, substantial evidence supports the juvenile court's finding by clear and convincing evidence that there would be a substantial danger to K.M.'s physical health, safety, physical or emotional well-being, and special needs if he is released to Father's custody. Substantial evidence also supports the finding that there are no reasonable means by which his physical health can be protected if he is released to Father.

Finally, Father contends the juvenile court's removal order was based on speculative concerns over future occurrences of past behavior, citing to *In re Jasmine G.* (2000) 82 Cal.App.4th 282 (*Jasmine G.*). According to Father, his decision to move to Las Vegas was the past behavior which led to the speculative concerns about his ability to care for K.M. We do not agree the juvenile court's concerns were speculative.

In *Jasmine G.,* the juvenile court ordered a teenager removed from her parents, who were separated and shared custody, because they each used corporal punishment to discipline their daughter. (*Jasmine G., supra,* 82 Cal.App.4th at p. 288.) The appellate court reversed the removal order because there was no evidence the daughter would be at risk of physical harm if returned to her parents. Both parents had forsworn corporal punishment, expressed remorse for their actions, attended parenting classes, and undergone therapy to improve their parenting skills. The daughter stated she did not fear her parents and wanted to return home. One therapist opined it was totally safe to return the child and the other simply had no recommendation. (*Id.* at pp. 288–289.)

Here, Father has not similarly demonstrated he regrets his failure to protect K.M. or that he has learned from his failures and will do better. Indeed, Father has not visited K.M. to

establish a relationship with him despite the juvenile court's admonishment that it would like to see some visits between Father and K.M. to ensure K.M. did not have an adverse reaction to Father.  Unlike *Jasmine G.*, the juvenile court's removal order in this case was not based on speculation.

## DISPOSITION

The challenged dispositional order is affirmed.

BIGELOW, P. J.

We Concur:

STRATTON, J.

WILEY, J.